Sidney O. SAMPSON, Plaintiff,

v.

C. Marshall DANN, Defendant.

Civ. A. No. 75–0901.

United States District Court,
District of Columbia.

Memorandum, Findings of Fact, and
Conclusions of Law Sept. 12, 1978.

Judgment and Order Sept. 12, 1978.

On Motion to Vacate Nov. 2, 1978.

Sidney O. Sampson, pro se.

Joseph F. Nakamura, Sol., U. S. Patent and Trademark Office, Washington, D. C., for defendant.

## MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

OBERDORFER, District Judge.

Sidney O. Sampson, a 75 year old inventor, proceeds here *pro se*. In 1976 Judge McGuire ordered the Commissioner of Patents and Trademarks to permit Sampson to cure formal defects in a 1967 patent of a control for sound recording and reproducing systems so that it could be reissued as Sampson had requested. He has filed this post-judgment "Motion For An Urgent Hearing in this Court of Equity Whereby

Plaintiff Can Be Given Due Process Proceedings Under 35 U.S.C. 151 Upon His Reissue Application Which this Court Remanded to the Commissioner For the Purpose of Granting the Plaintiff a Reissue Patent on the Reissue Application."

For the reasons set out below, the Court will enter judgment for plaintiff and direct the Commissioner to issue the patent in question.

## I.

### FINDINGS OF FACT[1]

From the filing of his first infringement suit in May of 1967, it took Sampson until July of 1977 to cure a technical defect in his patent application which blocked his efforts to protect his claimed invention in court. Because this history bears on the equities of Sampson's case and the Court's decision to grant Sampson relief at this juncture, it is set out in some detail.

On April 18, 1967, Sampson was issued Patent No. 3,315,041 for a "track selection control means for magnetic signal recording and reproducing systems." In May of that year, he filed a suit in the United States District Court for the Southern District of New York against Radio Corporation of America (RCA) charging infringement of that patent. In September of 1967 he brought a second infringement suit against Sony Corporation of America (Sony), and in October of 1968 a third against Ampex Corporation (Ampex). In May of 1968 RCA moved for summary judgment on the

ground that Sampson's patent was invalid under 35 U.S.C. § 102(b) because Sampson had published his invention in July of 1959, more than one year before he applied for a patent.[2] Sampson conceded that he had inadvertently published his invention, but argued that under 35 U.S.C. § 120,[3] his patent was entitled to a filing date of March 5, 1959, because on that date, which preceded the date of the inadvertent publication, he had filed application No. 797,412 for substantially the same invention. On October 25, 1968, the Court granted summary judgment for RCA. The applications Sampson relied upon to satisfy § 120 contained the serial numbers, titles, and subject matter disclosures, but did not state the filing dates of prior applications in the chain. The Court held, therefore, that, lacking the prior application filing dates, Sampson's "specific reference" was not specific enough. Sampson filed a motion to reargue the RCA case on November 1, 1968, and while the motion was pending, he filed a notice of appeal. On December 31, 1968, Sampson reached a settlement with RCA and his appeal was dismissed by stipulation. On the same day, the District Court denied the motion to reargue, so that although the case was settled, judgment was entered for RCA and against Sampson.

Meanwhile, on September 26, 1968, Sampson had entered into a stipulation with Sony to be bound by the result in the RCA litigation. Sampson sought to have the RCA judgment vacated, but his motion to vacate the RCA judgment was denied on January

---

1. The Court's findings are based on the undisputed facts set out in the submissions of the parties, in Judge McGuire's opinion, and in the opinion of the Court of Appeals for the Second Circuit in *Sampson v. Ampex Corporation,* 478 F.2d 339 (2d Cir. 1973).

2. 35 U.S.C. § 102(b) provides: "A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

Shortly after he first applied for a patent in early 1959, Sampson printed a brochure in which he described his invention. The Court

held that the ambiguous notice on the cover was not a sufficient "injunction of secrecy" to prevent the distribution of this brochure from being a publication.

3. 35 U.S.C. § 120 provides: "An application for patent for an invention disclosed . . . in an application previously filed . . . by the same inventor shall have the same effect . . . as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a *specific reference* to the earlier filed application." (Emphasis added.)

14, 1970. Thereafter, his complaint against Sony was dismissed pursuant to the earlier stipulation. The Second Circuit affirmed both decisions.[4]

While all this was going on, the Ampex suit had been stayed in the Southern District pending the outcome of the RCA and Sony appeals.[5] On May 31, 1971, the Supreme Court decided *Blonder Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), making the defense of collateral estoppel available in patent infringement suits. Thereafter, on July 6, 1972, Ampex was granted a summary judgment on the basis of the estoppel effected by the RCA decision. Sampson appealed and the Second Circuit once again affirmed.[6]

In January 1972, Sampson, with his unfortunate Sony experience behind him, returned to the Patent Office to cure the technical defects in his patent application by amending his earlier applications to include the required dates and sought reissue of his patent under 35 U.S.C. § 251.[7]

■ In an administrative proceeding which consumed the next three years, the Patent and Trademark Office refused to permit Sampson to amend his abandoned patent applications and therefore rejected his reissue applications for the same reasons Sampson's patent had been held invalid in the RCA case. From the decision of the Patent and Trademark Office Board of Appeals, Sampson appealed to this Court under 35 U.S.C. § 145. That section authorizes a disappointed patent applicant to ap-

ply to this Court for "remedy by civil action." In such an action this Court may adjudge that an applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Board of Appeals, as the facts in the case may appear, and such adjudication shall authorize the Commissioner to issue such patent in compliance with the requirements of the law.

On November 10, 1970, Judge McGuire entered judgment for plaintiff. Judge McGuire explained that "the legislative history makes it clear that equity shall guide section 251 actions," [8] and held that "equity would dictate" that Sampson be allowed to amend his abandoned applications to include the detailed references to dates which would allow a reissue of his letters patent. In conclusion, Judge McGuire stated: "[T]he matter is thus remanded to the Commissioner for the purpose of granting the plaintiff a reissue patent on his application in suit." [9] No appeal was taken from Judge McGuire's decision.

The Patent and Trademark Office's initial response to Judge McGuire's order was to refer Sampson's reissue application to an examiner. He ordered up the abandoned files, completed the references as ordered by Judge McGuire, conducted and updated search for interferences, and then signed the jacket of the file, signifying that he had reviewed it, and that in his opinion, the application was ready for allowance. The file was then transmitted together with drawings via Quality Control to the Issue

---

**4.** *Sampson v. Radio Corporation of America,* 434 F.2d 315 (2d Cir. 1970); *Sampson v. Sony Corporation of America,* 434 F.2d 312 (2d Cir. 1970).

**5.** See 434 F.2d at 314 n. 1 and *id.* at 317 n. 2.

**6.** *Sampson v. Ampex Corporation,* 478 F.2d 339 (2d Cir. 1973).

**7.** 35 U.S.C. § 251 provides: "Wherever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reasons of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to

claim in the patent, the Commissioner shall, on surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired term of the original patent.

. . . . .

The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent . . . ."

**8.** Judge McGuire's slip op. at 4.

**9.** *Id.* at 5.

Division.[10] On April 4, 1977, the Issue Division, pursuant to the administrative procedure set out in 35 U.S.C. § 151, sent a notice of allowance to Sampson, who promptly paid the requisite fee.[11] On April 8, 1977, when it received the fee, the Issue Division scheduled the issuance of the patent for July 12, 1977, and mailed Sampson a notice to that effect.[12]

Section 151 provides that "If it appears that an applicant is entitled to a patent under the law, a written notice of allowance of the application shall be . . . mailed to the applicant . . . specify[ing] a sum, constituting the issue fee . . . . Upon payment of this sum the patent shall issue . . . ."

Just over a decade after Sampson filed his infringement suit against RCA, it appeared that he had finally succeeded in remedying what was essentially a technical mistake in the nature of a pleading defect, and that he could resume his pending infringement suits against Sony and Ampex. On April 25, 1977, he filed in these actions in the Southern District of New York a petition for the return of his appeal bonds in each action, and for consolidation of the two actions. On March 3, 1977, Ampex, through its attorneys, filed a letter consenting to the return of the bond, and stating, "[I]n the event plaintiff seeks or attempts to obtain any further or different relief, we respectfully request a continuance to a later date together with a clear explanation of any additional relief to be sought."

By Memorandum of the Patent and Trademark Office Solicitor Joseph P. Nakamura dated May 30, 1978, the Patent and Trademark Office furnished Sampson and Sampson has furnished the Court with the Patent and Trademark Office's account of the communications which thereafter took place between Ampex and the Patent and Trademark Office:

This is in reply to the "Petition to the Commissioner Pursuant to Rule CFR 1.183" dated March 28, 1978, as well as follow-up papers dated May 10 and 16, 1978, (presently entered as Papers 74, 75 and 76, respectively). Since the "Petition . . ." does not seek a suspension or waiver of any regulation under 37 CFR 1.183, it is being treated merely as a request for information concerning the withdrawal of the application from issue. In that regard, the following narrative account should suffice.

On May 26, 1977, a summary of Judge McGuire's memorandum opinion was published by The Bureau of National Affairs, Inc., in its Patent, Trademark & Copyright Journal, No. 330, pp. A-4 and 5 (copy enclosed).

On June 22, 1977, Ampex Corporation filed its "Petition to the Commissioner for Access to Reissue Application" (Paper 47), in which reference was made to "prior art which was not cited by the Patent Office during the prosecution of the original application." Access was sought "so that Ampex can call this prior art and other defenses to the attention of the Examiner." No indication of service upon the applicant accompanied the petition for access.

Ordinarily, where there is no proof of service upon the applicant, a copy of the petition for access "is sent by the associate solicitor to the applicant, who is given a limited period, as a week or ten days,

---

10. This procedure in the Patent and Trademark Office was explained by counsel for the Commissioner at oral argument before the Court on April 20, 1978.

11. 35 U.S.C. § 151 provides in part:
    If it appears that applicant is entitled to a patent under the law, a written notice of allowance of the application shall be given or mailed to the applicant. The notice shall specify a sum, constituting the issue fee or a portion thereof, which shall be paid within three months thereafter.

*Upon payment of this sum the patent shall issue,* but if payment is not timely made, the application shall be regarded as abandoned. (Emphasis added.)

12. Counsel for the Patent and Trademark Office explained at oral argument that the timing of the printing of applications is based primarily on providing the contractor which performs this function for the Patent and Trademark Office with a steady supply of work.

within which to state any objection he may have to the granting of the petition" (M.P.E.P., Section 103). However, in this case, the reissue patent was scheduled to issue on July 12, 1977. Therefore, on a preliminary basis, Associate Solicitor Gerald H. Bjorge realized that submission by Ampex of the indicated "prior art" after his decision on its petition for access would probably be too late for consideration thereof by the examiner. Consequently, he advised Ampex's attorney John F. Flannery by telephone to promptly submit the "prior art" without waiting for access. Also, he advised Mr. Flannery that he would make sure the examiner got the "prior art" without delay if the submission were directed to his attention. Accordingly, on July 5, 1977, Ampex filed its "Citation of Prior Art" along with copies thereof (Paper 46).

Upon consideration of the "prior art" cited by Ampex, examiner Raymond F. Cardillo, Jr., Supervisory Patent Examiner Bernard Konick, and acting director Gareth D. Shaw jointly requested that the application be withdrawn from issue, because allowance of the involved claims was then determined to have been mistaken in view of the "prior art." That request was made orally to Edward E. Kubasiesicz, then the Petitions Examiner in the Office of the Deputy Assistant Commissioner for Patents, William Feldman, who directed the Office of Publications in an unnumbered paper dated July 6, 1977, to withdraw the application from issue "because newly discovered prior art raises serious questions of patentability" (Paper 44 and attachment). On July 8, 1977, acting manager Ruth C. Mason of the Publishing Division of the Office of Publications withdrew the application from the issue of July 12, 1977 (Paper 43). While Mr. Kubasiewicz was subsequently transferred to the Solicitor's Office, that move was made for reasons not related in any way to this application.

All written correspondence between the Office of the Solicitor and the examiner regarding Ampex's citations of prior art is in the application file (copy of memorandum re Paper 61 enclosed). There is no written correspondence between the Office of the Solicitor and the Office of the Deputy Assistant Commissioner for Patents regarding Ampex's citation of prior art.

Ampex made no effort to furnish Sampson notice about the alleged prior art, and the Commissioner elected not to do so before deciding not to issue the patent on July 12. Sampson saw July 12, 1977, come and go with no publication of the patent he had been formally notified would issue to him upon the payment of his fee.

On July 21, 1977, the Patent and Trademark Office mailed to Sampson a memorandum advising him that

[p]rior to the designated issue date, relevant prior art was discovered. On July 6, 1977, the Office of Publications was directed to withdraw the application from issue, if possible, because newly discovered prior art raises serious questions of patentability. The Office of Publications effected a withdrawal notice on July 8, 1977. No Letters Patent was mailed. The Official Gazette published July 12, 1977, indicates that no patent was issued for RE29,306.

Further communication applying the prior art will be forthcoming from the examiner.[13]

Sampson promptly resumed his efforts to have his reissue application allowed. On July 24, 1977, he sent a mailgram to the Solicitor challenging the withdrawal, and stating:

[T]he examiner has told me that the alleged new prior art presented by the opposition was not timely made according to the rules  .  .  .  [and] that such untimely presentations of alleged prior art cannot be entered, thus  .  .  .  the withdrawal of the reissue is illegal  .  .  .  .

**13.** Counsel for the Commissioner explained at oral argument that had the Patent and Trademark Office been unable to prevent the patent from issuing, the jurisdiction of the Patent and Trademark Office would have terminated.

Nevertheless, reexamination of the application proceeded. On September 17, 1977, Sampson wrote to the Solicitor and, among other things, again argued that consideration of the Ampex submission was improper. The Solicitor responded on September 23, 1977, that the regulation which Sampson cited (37 C.F.R. § 1.291, discussed below) applied only after a patent had actually been issued. On January 17, 1978, the Patent and Trademark Office mailed Sampson notice that his application had been finally rejected on the basis of the prior art cited by Ampex, and that he had three months to once again present his case to the Board of Appeals. Sampson promptly filed the motion now before the Court.[14] He has also appealed the Commissioner's decision of January 17, 1978 to the Board of Appeals, where it is now under advisement.

## II.

### CONCLUSIONS OF LAW

A. *Jurisdiction*

■■ 1. Judge McGuire's Order of November 10, 1976, determined that this Court has jurisdiction over this matter. 35 U.S.C. § 145. Sampson's pending motion effectively invokes that jurisdiction. If, as alleged, the Patent and Trademark Office failed to provide the relief called for by the letter or spirit of Judge McGuire's Order, Sampson has no obligation to return to the Board of Appeals before he asks this Court to clarify and enforce that order.

■ 2. Sampson claims to have become entitled to a reissue patent by operation of law before Ampex submitted the prior art allegation to the Patent and Trademark Office. He further claims that Ampex's *ex parte* communication of the alleged prior art should not have been received, much less facilitated and acted on, by the Patent and Trademark Office. Accordingly, he asks for a court declaration that he became entitled to a patent before

the Ampex submission and that the Patent and Trademark Office's decision not to issue that patent as scheduled because of patentability questions raised by the Ampex allegations without affording him notice or any opportunity to respond was illegal, arbitrary and fundamentally unfair. These claims frame issues over which this Court has jurisdiction, both inherent in, and ancillary to, the jurisdiction originally exercised by Judge McGuire. 28 U.S.C. § 1331(a); *Phillips Petroleum Company v. Brenner*, 127 U.S.App.D.C. 319, 322, 383 F.2d 514, 517 (1967). If the Sampson patent scheduled for publication on July 12, 1977, in response to Judge McGuire's 1976 Order had, in fact, been published, and the Patent and Trademark Office had attempted to cancel it administratively (with or without a post-cancellation hearing), this Court would have had jurisdiction to adjudicate the legality of the action and to declare it illegal and irreparably injurious to Sampson. If, as claimed, the notice of allowance and fee payment gave Sampson an enforceable right to a patent, the Court has equivalent jurisdiction. And this jurisdiction embraces both the power to decide whether the action of the Patent and Trademark Office was, as between Sampson and the Patent and Trademark Office, the legal equivalent of actual publication, and the corollary power to remedy any irreparable resulting injury threatened to Sampson. *See Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

B. *The Merits*

1. Judge McGuire's 1976 Order, in effect, required the Patent and Trademark Office to permit Sampson to correct his file, to reexamine his application, and, if he was entitled to a patent, to proceed promptly and correctly to issue it.

■■ 2. Sampson sought a re-issue of his patent; the statutory provisions govern-

---

14. While his petition has been pending before this Court Sampson has continued the prosecution of his case in the Patent Office. On January 30, 1978, Sampson formally petitioned the Commissioner to countermand the withdrawal of his application from issue. This petition was denied on March 16, 1978.

ing original issue apply also to re-issue. 35 U.S.C. § 251. On remand the Patent and Trademark Office was required by Judge McGuire's Order and by the statute to make an "examination . . . of the application and the alleged new invention." 35 U.S.C. § 131. In that connection the Patent and Trademark Office could have requested Sampson (and his litigating adversaries, including Ampex) to make representations about prior art. *See* Parker, *Current Developments at the Patent and Trademark Office*, 60 Journal of the Patent Office Society, 57, 60 (1978). But no such request was made. Nor did Ampex or any other users of Sampson's claimed invention volunteer any submission to the Patent and Trademark Office while the § 131 examination was in progress.

3. In due course, as contemplated by Judge McGuire's order and the statutory scheme, the Patent and Trademark Office completed a fresh § 131 examination, determined that Sampson was entitled to a patent, mailed to him written notice of allowance, and solicited and received from him the fee required for issuance of his patent. The relevant statute states that once the Patent and Trademark Office has made such an entitlement determination, has furnished allowance notice and has received a fee payment, "the patent shall issue." [15]

4. Before oral argument the Court requested the parties to furnish legislative history materials, court decisions and evidence of Patent and Trademark Office administrative practice relating to its power to refuse to issue a patent after application has reached the state where § 151 indicates that "the patent shall issue." The parties' response and the Court's independent research have disclosed only one instance at least since 1965 where the Patent and Trademark Office failed to issue a patent which had been processed to the stage reached by Sampson here. In that case the decision to issue the previously allowed patent was cancelled because of fraud by the applicant.

5. There is no suggestion by the Patent and Trademark Office that Sampson has been anything but diligent and honorable in the prosecution of his claims. There is no hint of fraud.

6. Although Sampson's application has been before the Patent and Trademark Office in one form or another at least since 1967, has been strenuously litigated and court decisions about it have been publicly reported, the Patent and Trademark Office offered no explanation for its failure to discover the prior art before Ampex alleged it a few days before publication of Sampson's patent was scheduled.

7. Patent and Trademark Office regulations governing public protests against the granting of a patent application and citations of prior art provide with respect to notice to applicants that:

> Protests and prior art citations by the public and any accompanying papers should either (1) reflect that a copy of the same has been served upon the applicant . . . or (2) be filed with the [Patent and Trademark] Office in the event service is not possible. 37 C.F.R. § 1.291(c) (1977).

This regulation contemplates that the protester should give the applicant notice of the protest and that if this is not accomplished, the Patent and Trademark Office will be furnished a copy so that it can endeavor to do so. As a result, the Patent and Trademark Office will ordinarily afford an applicant notice and an opportunity to respond to any protest or citation of prior art affecting an application.

8. In view of the foregoing conclusions, the Patent and Trademark Office was legally obligated to issue a patent to Sampson on July 12, 1977, and was not relieved of that obligation by receipt of Ampex's *ex parte* prior art allegations. The statute provides that upon completion of examina-

---

15. 35 U.S.C. § 151. *See also Brenner v. Ebbert*, 130 U.S.App.D.C. 168, 170, 398 F.2d 762, 764 (1968) ("Congress established a separate statutory framework for . . . issuance of the patent. It is a relatively ministerial act; if the issue fee is timely tendered, the patent must issue.")

tion, allowance notice and fee payment, the "patent shall issue." It may be that fraud by the applicant, or even good cause for the failure by the Patent and Trademark Office to discover the prior art earlier would justify a court-fashioned exception to the statutory command. For example, Patent and Trademark Office custom might have established and Congress might have accepted such an exception. But the Patent and Trademark Office has failed to offer any persuasive proof of such a custom or its acceptance by Congress. Moreover, there is a substantial difference between fraud or other questionable action by an applicant which might justify such an exception and the receipt of prior art allegations raising routine substantive questions about patentability of a widely known invention claim which is at least ten years old.

9. All of the familiar policies which are effected by statutes of limitation, principles of estoppel and res judicata justify strict application in Sampson's case of the statutory provision that, after allowance, notice and payment, "the patent shall issue." Sampson is 75 years old and not in good health. He has shown unique persistence and skill in the prosecution of his patent right claims here and in the infringement cases in New York. His continued personal participation in those proceedings may make the difference between vindication of a valid claim and loss of it. Delay has already inflicted irreparable injury upon Sampson's unique personal ability to attempt to collect royalties for himself and his heirs and successors. Without court relief the injury may become more serious and permanent.

10. A decision for Sampson in the unique circumstances here would not materially affect the public interest in limiting patent monopolies. See e. g. *Graham v. John Deere Co.*, 383 U.S. 1, 7, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Patent and Trademark Office's over-all effectiveness as a protector of that public interest might well be enhanced by strict and merciful cut-off of Patent and Trademark Office

consideration of an individual patent application once notice and payment have been effected, particularly one that has been so prominent and protracted as Sampson's.[16]

Moreover, Sampson's claimed invention is already available to the public as a result of its apparent use by Ampex, Sony and RCA. Sampson's earlier settlement with RCA assures that issuance of a patent to him would not remove his invention from the public domain. Nor would Ampex be required to discontinue, or even to pay Sampson for, any use it may have been making of his invention, unless it should lose the infringement case Sampson brought against it in the Southern District of New York. Moreover, that infringement action would presumably adjudicate the same prior art issue now under submission in the Board of Appeals. See *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Finally, this Court's decision does not affect the authority of the Attorney General to sue to cancel Sampson's patent after it is issued if, for example, it offends the public interest in protection against unjustified patent monopolies. See *Deller's Walker on Patents*, §§ 217–18 (1965).

11. The error of the Patent and Trademark Office's action, as it affects Sampson, is not curable by the post-denial notice and hearing afforded Sampson by the Patent and Trademark Office. Congress' statement that in the circumstances such as here "the patent shall issue," created an enforceable right in Sampson. Neither Congress nor any regulations provided for *ex parte*, prehearing Patent and Trademark Office Termination of such a right, subject to possible reinstatement after later notice and administrative hearing. *Compare Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). The improvised process used on Sampson was irregular and *ad hoc*. No fraud-like circumstances justified the arbitrary development and application of that process to his case. The action taken by the Patent and Trademark Office in

---

**16.** The Office could use its limited resources on other cases.

their illegal and arbitrary process must, therefore, be vacated and Sampson's injury remedied.

## C. *Conclusion*

■ Accordingly the Court will enter a Judgment and Order declaring:

1. It has continuing jurisdiction of this matter.

2. Sampson was entitled to a reissue patent on July 12, 1977.

3. The Patent and Trademark Office's decision not to publish the patent at that time was illegal and arbitrary.

4. That decision caused plaintiff irreparable injury and threatens permanent injury to him.

5. This illegal and arbitrary action and its effect on plaintiff is not curable by the subsequent notice and hearing furnished to Sampson.

In aid of this declaration the Order will direct the Patent and Trademark Office to issue the patent to Sampson as soon as is physically practicable.

## JUDGMENT AND ORDER

On consideration of the briefs, memoranda and documentary evidence submitted by both parties and the oral argument by counsel for the defendant (the plaintiff proceeding *pro se* being physically unable to attend the oral argument), and for the reasons stated in the accompanying Findings of Fact and Conclusions of Law, it is this 12th day of September, 1978.

ADJUDGED and DECLARED that:

1. This Court has continuing jurisdiction of this matter.

2. Plaintiff was entitled to reissue of a patent originally scheduled for reissue and publication on July 12, 1977.

3. Defendant's decision not to reissue or publish that patent at that time was illegal and arbitrary.

4. That decision caused plaintiff irreparable injury and threatens permanent injury to him.

5. Defendant's illegal and arbitrary action and its effect on plaintiff are not curable by the post-decision notice and hearing furnished to plaintiff by defendant, and it is

FURTHER ORDERED, ADJUDGED and DECREED that

1. Judgment is hereby entered for plaintiff.

2. Defendant shall, as soon as is physically practicable, issue to plaintiff and publish the patent which was formerly scheduled for issue and publication on July 12, 1977.

## ON MOTION TO VACATE

The defendant moves to vacate the Court's Order of September 12, 1978, on the ground, among others, that it was based on a misapprehension of administrative practices. Plaintiff was not represented by counsel, and was unable to appear physically at the oral argument so that the Court looked to the official defendant for guidance in a field previously unfamiliar to the Court. On April 12, 1978, before the oral argument, the Court entered an Order requesting advice about, among other things:

the Commissioner's practice with respect to refusing to issue patents after notice of allowance has been given, where the applicant timely pays all required fees.

(A copy of this Order is attached as Appendix A.) At the oral argument, a colloquy about the administrative practice included the following:

THE COURT: Do you know it as a practice to withdraw cases because of prior art?

MR. SEARS: I can, of course, refer to the *Hunt* and *Hull* cases.

THE COURT: Well, they are pretty old. What I want to know is what these guys do down there every day.

MR. SEARS: This isn't an every-day occurrence, believe me.

THE COURT: Well, every year since 1875. There must have been several cases.

MR. SEARS: I suppose that, again, if it would be helpful, we could document a few.

THE COURT: All right.

MR. SEARS: I can't document those cases which never issued as patents, though.

(Excerpts from the transcript of the oral argument are attached as Appendix B.) Defendant's Memorandum in support of his Motion now urges, nevertheless, that there is an administrative practice, supported by regulation and an 1878 decision of the Secretary of the Interior, of withdrawal of applications in certain circumstances after notice of allowance and fee payment.

The cited regulation provides, as does the governing statute, 35 U.S.C. § 151, that upon such notice and payment the patent is to issue. The regulation, unlike the statute, goes on to say that the Commissioner may withhold such issue even after notice of allowance and payment because of:

mistake on the part of the [Patent] Office, or because of fraud or illegality in the application, or for interference. 37 C.F.R. § 1.313(b) (1978).

And the Patent and Trademark Office has now submitted examples of recent withdrawals pursuant to that regulation. For example, the Patent and Trademark Office withdrew on its own initiative a number of applications involving computer programming after payment of the fee following the Supreme Court's decision in *Gottschalk v. Benson, et al.,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), holding that certain such programs are not patentable.

▮ Whatever may be the validity of that regulation and these withdrawals in light of the statute's peremptory language, the claimed exceptions do not by terms or example justify withdrawal here. This withdrawal was effected *ad hoc* in response to an irregular, *ex parte* communication from the applicant's litigating adversary. That is quite different from a withdrawal, for example, for fraud or in deference to a landmark decision of the United States Supreme Court. Defendant's contentions are unpersuasive, and the Court will deny the Motion.

▮ The Court is impressed, however, by defendant's representation that the Patent Board of Appeals may soon decide plaintiff's pending appeal from the denial of his reissue application. In order to give the parties reasonable opportunity to have a complete record, the Court will grant a limited stay of the effective date of its order to permit consideration of that decision when it becomes available. To this end the Court requests that the parties submit a copy of that decision as soon as possible after it becomes available.

Accordingly, after review of defendant's Motion to Vacate Judgment and Motion for Stay, and the points and authorities cited therein, it is this 2d day of November 1978, hereby

ORDERED: That the Motion to Vacate Judgment is DENIED, and it is

FURTHER ORDERED: That the Judgment and Order filed September 12, 1978, is hereby stayed until December 1, 1978, to permit reconsideration or modification in light of the forthcoming decision of the Board of Appeals, unless otherwise ordered by this Court on application of either party.

*Appendix A*

ORDER

The Court, having considered the Motion recently filed by Sidney Sampson and the Opposition thereto filed by the Commissioner, finds that oral argument on several issues raised by pleadings of the parties would be useful. Accordingly, it is this 11th day of April 1978, hereby

ORDERED: That argument is set for April 20, 1978, at 3:00 p. m. in Courtroom No. 4, U.S. Courthouse, Washington, D.C., on the following issues:

1. What is the Commissioner's practice with respect to refusing to issue patents after notice of allowance has been given, where the applicant timely pays all required fees?

2. In light of 35 U.S.C. § 151, and in particular the change in that section effected by Pub.L. 89–93, §§ 4, 6, 79 Stat. 260–61 (1965), what is the Commissioner's authority, if any, to refuse to issue a patent after notice of allowance has been given, assuming that the applicant timely pays all required fees?

3. Would such a refusal on the part of the Commissioner be reviewable before the Board of Appeals?

4. Where, as here, the District Court for the District of Columbia, having jurisdiction under 35 U.S.C. § 145, has found for the applicant and remanded to the Patent Office for the purpose of issuing a patent, does the District Court retain jurisdiction to review procedural questions, such as those framed above, which arise in the processing of the applicant's patent on remand?

*Appendix B*

(NOTE: This is an excerpt of transcript in *Sampson v. Gottschalk*, CA 75–901, heard on April 20, 1978, before The Honorable Louis F. Oberdorfer, United States District Judge, pertaining to the colloquy between The Court and Mr. Sears.)

. . . . .

THE COURT: Can I come back to you just a minute, if we are past one and two, to the Commissioner's practice with respect to refusing to issue patents and the authority for that?

Can you make any representation to me with respect to the practice as it relates to cases where you have sent out the notice, received the fee, and then receive information, from whatever source, as to whether there is an invention?

MR. SEARS: Well, Mr. Sampson has included a section from our manual, this MPEP, bearing upon handling of protests. And it is clear, in certain passages in that material, that a protestor should get his material to the Examiner soon enough so that it can be considered.

Now, I am not prepared to say what the cut-off would categorically be in other cases. All I can tell you is what happened in this case.

THE COURT: My question was directed to the practice. Am I to close this record with the statement that the Commissioner could cite no case where, in the past, the Patent Office has interdicted the issuance of a patent after the notice has gone out on account of information about invention? You cite this case. I am asking for any other cases.

MR. SEARS: Well, all right. Judge Richey has a case, which he has referred to Magistrate Margolis, the Altenpohl case, where the case was withdrawn from issue not once but twice after payment of issue fees.

THE COURT: For what reason?

MR. SEARS: The first had to do with mistake on the part of the office.

THE COURT: Such as?

MR. SEARS: Such as failure to consider the question of fraud raised in a collateral suit in Georgia.

THE COURT: Fraud?

MR. SEARS: Fraud.

THE COURT: Okay. That is one case.

MR. SEARS: Also tied in with that is a very real consideration of prior art, because the particular prior art involved . . .

THE COURT: In this case, there is prior art.

MR. SEARS: Yes.

. . . was later the basis of a Section 102 rejection sustained by the CCPA on appeal.

THE COURT: You can't cite me a case in which there wasn't an element of fraud. Because I can understand fraud.

Is this something you want to come back to me about?

MR. SEARS: I suppose, if it is necessary.

THE COURT: Are you comfortable about it?

MR. SEARS: I am comfortable with it.

THE COURT: Do you know it as a practice to withdraw cases because of prior art?

MR. SEARS: I can, of course, refer to the Hunt and Hull cases.

THE COURT: Well, they are pretty old.

What I want to know is what these guys do down there every day.

MR. SEARS: This isn't an every-day occurrence, believe me.

THE COURT: Well, every year since 1875. There must have been several cases.

MR. SEARS: I suppose that, again, if it would be helpful, we could document a few.

THE COURT: All right.

MR. SEARS: I can't document those cases which never issued as patents, though.

THE COURT: I need the cases that somebody pulled the plug after the matter had been sent to the issue office.

MR. SEARS: Well, it is done most frequently, I would say, in connection with interference.

THE COURT: Interference is clear.

MR. SEARS: I submit if it can be done for any reason, it belies Mr. Sampson's interpretation of the statute, including fraud.

THE COURT: Fraud is different. You can do anything on account of fraud.

MR. SEARS: Well, not according to Mr. Sampson's literal interpretation.

THE COURT: He is not bound by his representations. I am trying to draw lines here.

Let's take a brief recess. . . .

(NOTE: This ends the excerpt.)