**BLACKLIGHT POWER, INC., Plaintiff,**

v.

**Q. Todd DICKINSON, Commissioner of Patents and Trademarks, Defendant.**

**Civil Action No. 00–422(EGS).**

United States District Court, District of Columbia.

Aug. 15, 2000.

Michael H. Selter, Farkas & Manelli, P.L.L.C., Jeffrey Allan Simenauer, Washington, DC, for Plaintiff.

Fred E. Haynes, U.S. Attorney's Office, Washington, DC, Kevin Gerard Baer, Patent & Trademark Office, Office of the Solicitor, Arlington, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

## I. Introduction

Plaintiff Blacklight Power, Inc., alleges that defendant Q. Todd Dickinson, Commissioner of the Patent and Trademark Office (PTO), violated the Administrative Procedure Act (APA), 5 U.S.C. § 706 *et seq.*, when the PTO withdrew one and threatened to withdraw four others of plaintiff's patents from issue after plaintiff had received a "Notice of Allowance and Issue Fee Due" and payed the issue fee. The issues presented are whether the defendant had the authority to withdraw plaintiff's patent after plaintiff had paid the issue fee, and, if defendant did have the authority, whether that withdrawal was arbitrary and capricious. Plaintiff claims that defendant's actions were arbitrary and capricious, and that the internal regulation on which defendant relies contravenes the governing patent statute. Pending before the Court are the parties' cross motions for summary judgment. Upon consideration of the parties' motions, memoranda in support, responses in opposition, replies in support, and the arguments at the May 22, 2000 motions hearing, plaintiff's motion for summary judgment [11–1] is **DENIED**, and defendant's motion for summary judgment [13–1] is **GRANTED**.

## II. Factual Background

Plaintiff has filed a series of five patent applications for technology that, according to plaintiff, represents a new source of chemical energy from hydrogen. One of these, titled "Lower–Energy Hydrogen Methods and Structure," was filed March 21, 1997. This application was issued as U.S. Patent No. 6,024,935 (the '935 patent) on February 15, 2000. Another of these, Ser. No. 09/009,294 (the '294 application), titled "Hydride Ions," had been filed January 20, 1998. During prosecution of the '294 application, plaintiff cited over 130 prior art articles concerning "cold fusion" and "perpetual motion." When the primary patent examiner raised issues relating to the operability of the '294 technology, plaintiff conducted a personal interview with the examiner to discuss the articles

and the operability issues. On October 18, 1999, defendant issued a Notice of Allowance and Issue Fee Due for the '294 application (Notice). The Notice reads:

> THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. *PROSECUTION ON THE MERITS IS CLOSED.*
> THE ISSUE FEE MUST BE PAID WITHIN *THREE MONTHS* FROM THE MAILING DATE OF THIS NOTICE ... Pl.'s Mot. for Summ. J., Ex. 2.

Plaintiff paid the issue fee three days later, October 21, 1999. *See* Pl.'s Mot. for Summ. J., Ex. 3. Following payment of the issue fee, the '294 application was set to issue as U.S. Patent No. 6,030,601 on February 29, 2000.

On February 17, 2000, twelve days before the '294 application was to issue, Frances Hicks, a Petitions Examiner with the Office of Petitions, Office of the Deputy Assistant Commissioner for Patent Policy Projects, issued a Notice (February 17 Notice) informing plaintiff that, by request of the Director of the Special Program Law Office, "the ['294] application ... is being withdrawn from issue pursuant to 37 C.F.R. § 1.313 ... to permit reopening of prosecution." Pl.'s Mot. for Summ. J., Ex. 4. It is uncontested that the '294 application file was not in defendant's possession at the time this Notice was sent.

Upon receiving the February 17 Notice, plaintiff's patent counsel began investigating the circumstances surrounding the withdrawal, contacting different PTO employees by telephone and by mail, including Ms. Hicks, and Director Esther Kepplinger. On February 28, 2000, plaintiff's patent counsel hand-delivered a final letter asking that the withdrawal be reconsidered. Director Kepplinger met with him to receive the letter. She conceded that she still did not have a copy of the '294 application, at which time plaintiff's patent counsel provided her with a copy of his own '294 application file. *See* Pl.'s Mot. for Summ. J. at 10; Melcher Decl. ¶ 22. In that meeting, Director Kepplinger indicated that she was concerned that the '294 technology involved "cold fusion" and "perpetual motion." [1] She also stated that the PTO intended to withdraw from issue four others of plaintiff's patents-in-application.[2] *See* Verified Compl. ¶ 22.

Pursuant to 37 C.F.R. § 1.181(a)(3), defendant treated plaintiff's February 28 letters to the Commissioner, Director Robert Spar, and Director Kepplinger, as a single petition requesting that the Commissioner exercise his supervisory authority and reverse the PTO's withdrawal decision. In a decision issued March 22, 2000 (March 22 Decision), defendant denied plaintiff's petition, refused to rescind the February 17 Notice, and disallowed plaintiff's patent. *See* Pl.'s Mot. for Summ. J., Ex. 8. The March 22 Decision indicated that the reason behind the withdrawal of the '294 application was its similarity to the '935 patent, both of which claimed to attain energy levels below the ground state according to a "novel atomic model." *See* Pl.'s Mot. for Summ. J., Ex. 8 at 2. Both claim that the electron of a hydrogen atom can attain an energy level and orbit below the 'ground state' corresponding to a fractional quantum number. According to defendant, this assertion alarmed the Director, who had

---

**1.** In plaintiff's motion for summary judgment, plaintiff details that Director Kepplinger indicated that Commissioner Dickinson had telephoned her and told her to re-evaluate the '294 application after receiving communications from undisclosed third-party sources complaining about the '935 patent. See Pl.'s Mot. for Summ. J. at 11. However, at the May 22, 2000 motions hearing, for the purposes of the summary judgment motion, plaintiff's counsel retracted its argument that the withdrawal of the '294 application was in response to pressure outside of the PTO. See May 22, 2000 Hr'g. Tr. at 52.

**2.** The four other patent applications are: Ser. No. 09/008,947, filed January 20, 2998; Ser. No. 09/009,455, filed January 20, 1998; Ser. No. 09/009,678, filed July 7, 1998; and Ser. No. 09/111,160, filed July 7, 1998.

examined the '935 patent, and who had learned of the '292 application, because it "did not conform to the known laws of physics and chemistry." *Id.* The March 22 Decision states that the Director "was immediately aware that any pending application embodying such a concept raise[d] a substantial question of patentability of one or more claims which would require re-opening prosecution." *Id.*

## III. Procedure

Plaintiff filed this lawsuit on March 1, 2000. Plaintiff's complaint consists of two counts. Count I seeks preliminary and permanent injunctive relief directing defendant to issue the five contested patents-in-application as patents. Count II seeks a declaratory judgment that defendant's withdrawal of the patent applications was arbitrary and capricious and contrary to the PTO's own regulations and to the applicable patent issue statute. Plaintiff filed its motion for a temporary restraining order and preliminary injunction on March 2, 2000. At their March 3, 2000 hearing, the parties agreed that plaintiff would withdraw its motion without prejudice, and defendant would not take any Office Action with respect to the patents-in-application. On March 8, 2000, the Court issued an order memorializing that agreement, and setting a briefing schedule. Defendant filed the administrative record on March 22, 2000. The parties filed their cross motions for summary judgment on April 4, 2000. They filed their responses in opposition on April 18, 2000. Plaintiff filed its reply in support on May 1, 2000, and defendant filed its reply in support on May 5, 2000. The Court held a motions hearing on the cross motions for summary judgment on May 22, 2000.

## IV. Discussion

The Court must examine several questions to resolve the pending cross motions. First, the Court must determine whether defendant has the authority to withdraw plaintiff's patent after plaintiff has paid the issue fee. If the Court determines that the PTO did possess the requisite authority, then the Court must conclude which PTO issuance, the February 17 Notice or the March 22, 2000 Decision, constitutes final, reviewable agency action. As the last step, the Court must determine whether that final agency action was arbitrary and capricious in contravention of the APA.

### A. Whether the PTO Has the Authority To Withdraw Plaintiff's Patent After Payment of the Issue Fee

Plaintiff argues that the PTO does not have the authority to withdraw plaintiff's patent after payment of the issue fee for three reasons: 1) because doing so violates the plain language of the statute, 2) because the PTO regulation on which defendant bases its authority violates the plain language of the statute, and 3) because case law directs defendant to issue the patent upon payment of the fee.

#### 1. *Patent Issuance Statute:* 35 U.S.C. § 151

The parties interpret 35 U.S.C. § 151, the statute governing the issuance of patents, to support their respective positions by focusing on different sections of the statute. 35 U.S.C. § 151 provides in relevant part:

**If it appears that applicant is entitled to a patent under the law,** a written notice of allowance of the application shall be given or mailed to the applicant. The notice shall specify a sum, constituting the issue fee or a portion thereof, which shall be paid within three months thereafter.

*Upon payment of this sum the patent shall issue,* but if payment is not timely made, the application shall be regarded as abandoned. 35 U.S.C. § 151 (emphases added).

Plaintiff focuses on the italicized language directing that "[u]pon payment of [the issue fee] the patent shall issue." It is well-established that "shall" is the "language of

command." *Boyden v. Commissioner of Patents*, 441 F.2d 1041, 1042 n. 3 (D.C.Cir. 1971), *cert. den.*, 404 U.S. 842, 92 S.Ct. 139, 30 L.Ed.2d 77 (1971). Here, it is uncontroverted that the Notice of Allowance for the '294 application stated that the application was "allowed for issuance as a patent" and that "prosecution on the merits is closed." Pl.'s Mot. for Summ. J., Ex. 2. It is also uncontroverted that plaintiff paid the appropriate fees. Accordingly, plaintiff contends that defendant's defalcation is at loggerheads with the statute's clear command.

Defendant argues that if the statute is read *in toto*, *see Dole v. United Steelworkers of America*, 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990), it is clear that the withdrawal of these patent applications is within the PTO's power. Defendant notes that the entire section is premised on whether "it appears that [the] applicant is entitled to a patent under the law." Here, defendant contends, that is not so, because of plaintiff's claims of having attained an energy level and orbit below the hydrogen "ground state" corresponding to a fractional quantum number. Defendant also reminds the Court that even though the word "shall" generally is interpreted as imposing a mandatory duty, "shall" may also be interpreted differently depending on its context. *See LO Shippers Action Committee v. ICC*, 857 F.2d 802, 806 (D.C.Cir.1988). As a result, defendant contends, plaintiff's textual argument is not persuasive.

■ The parties clash over the appropriate standard of review for the PTO's interpretation of 35 U.S.C. § 151. Plaintiff contends that, since the language of 35 U.S.C. § 151, the patent issuance statute, is unambiguous, the proper statutory construction of § 151 is a question of law that the court decides without deference to the PTO's interpretation. In *In re Portola Packaging Inc.*, 110 F.3d 786, 788 (Fed. Cir.1997), the court held that judicial inquiry is "complete" when the terms of a statute are unambiguous. Plaintiff argues that § 151 is unambiguous because it dictates that the "patent shall issue" upon payment of the issue fee.

Defendant responds that the PTO's interpretation of 35 U.S.C. § 151 is due *Chevron* deference, and should be upheld. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "When faced with a problem of statutory construction, [the reviewing court should] show[ ] great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The PTO Director is charged with administering 35 U.S.C. § 151. Accordingly, defendant maintains, the Court should grant defendant's interpretation considerable deference. For additional support, defendant cites *Harley v. Lehman*, 981 F.Supp. 9 (D.D.C.1997). The *Harley* court held that the PTO's interpretation of § 151 is due *Chevron* deference, and that the PTO's interpretation was reasonable in light of the agency's "duty to ensure that the patents it issues are valid." *Id.* at 11. The Court is persuaded that the holding of the *Harley* court, which applied to a situation factually and procedurally identical to the present case, applies to the present case.[3] Therefore, the Court will accord the PTO's interpretation of 35 U.S.C. § 151 the deference it is due under *Chevron*.

■ Examining the parties' interpretations under the by now familiar *Chevron* two-step inquiry, this Court concludes that defendant's interpretation of the plain language 35 U.S.C. § 151 should be upheld. *See Harley*, 981 F.Supp. at 11. The code premises issuance of a patent upon payment of the issue fee "[i]f it appears that applicant is entitled to a patent under the law . . . ." *See* 35 U.S.C. § 151. These words clearly establish the PTO's mandate

---

**3.** For a more in-depth discussion of Harley, see A.3., "Caselaw."

to issue valid patents. *See In re Etter*, 756 F.2d 852 (Fed.Cir.1985).

### 2. *PTO's Administrative Regulation: 37 C.F.R. § 1.313(b)*

■ Plaintiff asseverates that 37 C.F.R. § 1.313(b), the PTO regulation implementing § 151, on which the PTO based withdrawal of the '294 application and its proposed withdrawal of the other four allowed applications, is invalid. Plaintiff contends that that regulation violates § 151's mandate that patents shall issue upon payment of the issue fee. 37 C.F.R. § 1.313(b) provides:

> When the issue fee has been paid, the application will not be withdrawn from issue for any reasons except:
>
> (1) a mistake on the part of the Office;
>
> (2) a violation of § 1.56 [fraud] or illegality in the application;
>
> (3) *unpatentability of one or more claims* . . .

37 C.F.R. § 1.313(b) (emphasis added). The gravamen of plaintiff's regulatory argument is that the issue before the Court is not whether the PTO is obligated to determine a claim's patentability, but when it must make this determination. Plaintiff argues that § 151 and its legislative history indicate that the PTO must make this determination before issuance of the notice of allowance and payment of the issue fee.[4]

Defendant counters that the PTO has long had the discretion to withdraw a patent even after payment of the issue fee on unpatentability grounds. Subsection (3) was added to 37 C.F.R. § 1.313(b) in 1982. However, even before the addition of the

"unpatentability" language, the PTO had the discretion to withdraw applications from issue on the basis of "mistake on the part of the Office" or subsection (1). The mistake ground was consistently held to envelop subsequently discovered reasons undermining an application's patentability. *See, e.g., Hull v. Commissioner of Patents*, 9 D.C. (2 MacArth.) 90 (1875)(denying writ of mandamus requesting issue of withdrawn patent). Indeed, defendant argues that the Director has not only the discretion but the duty to withdraw a patent from issue if there is a question about its patentability. *See In re Alappat*, 33 F.3d 1526, 1535 (Fed.Cir.1994)(en banc)(plurality opinion) (holding that the "Commissioner has an obligation to refuse to grant a patent if he believes that doing so would be contrary to law").

As for the standard of review of the PTO's adoption of 37 C.F.R. § 1.313(b), its own regulation, plaintiff offers two arguments to support its contention that the Court's review should be more searching and less deferential. First, plaintiff argues that 37 C.F.R. § 1.313(b) does not have the force and effect of law, because the PTO does not have substantive rulemaking powers outside of its own regulations,[5] and so the regulations are not entitled to the Court's deference.

Alternatively, plaintiff avers that, even if the Court were persuaded that deference is owed § 1.313(b) because it concerns patent proceedings, the regulation still cannot be "inconsistent with law," and under this standard, § 1.313(b) is invalid. Even where an agency's interpretation is entitled to deference, "the courts are the

---

**4.** Plaintiff compares § 151 to 35 U.S.C. § 303, the patent reexamination statute, which allows reexamination of a patent only if there is a "substantial new question of patentability." The Federal Circuit, dismissing the PTO's reliance on its Manual of Patent Examining Procedure (MPEP), held that this statute does not allow reexamination of patent claims on ground considered before the patent was issued, even though reexamination might reveal that the requirements for patent-

ability had not been met. *In re Recreative Technologies Corp.*, 83 F.3d 1394, 1397 (Fed. Cir.1996).

**5.** 35 U.S.C. § 6 empowers the Commission to "establish regulations, not inconsistent with law, for the conduct of proceedings in the Office." Accordingly, the Commissioner may issue only those regulations concerning the conduct of PTO proceedings.

final authority on the issue of statutory construction. They must reject administrative constructions, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). Here, plaintiff claims, Congress has explicitly spoken to the salient issue, and so the court "must give effect to the unambiguously expressed intent of Congress." *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 1299, 146 L.Ed.2d 121 (2000).

Defendant maintains that *Chevron* deference is appropriate here as well, on several grounds. First, as noted above, defendant argues that this regulation is due great deference because it was propounded pursuant to a statute that the PTO Director is charged with administering. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Second, defendant argues that the Court must "accord[ ] considerable weight to the prior long-standing interpretation, if reasonable, of the agency charged with administering a regulatory scheme," *see Craft Machine Works, Inc. v. United States*, 926 F.2d 1110, 1114 (Fed.Cir.1991), and that 35 U.S.C. § 151 and 37 C.F.R. § 1.313(b) have co-existed without incident under that "prior long-standing interpretation." [6]

This Court is persuaded by defendant's argument. According the PTO's adoption of 37 C.F.R. § 1.313(b) appropriate deference under *Chevron*, this Court holds that the PTO's regulation is eminently reasonable, in light of the PTO's purpose of issuing valid patents, and contravenes nei-

ther the spirit nor the letter of 35 U.S.C. § 151.

### 3. Caselaw and Intersection between 35 U.S.C. § 151 and 37 C.F.R. § 1.313(b)

Plaintiff cites three cases in support of its argument that, once patent fees have been paid, issuance of the patent is a required administrative formality.[7] In *Brenner v. Ebbert*, 398 F.2d 762 (D.C.Cir.1968), *cert. den.*, 393 U.S. 926, 89 S.Ct. 259, 21 L.Ed.2d 262 (1968), the D.C. Circuit stated that "if the issue fee is timely tendered, the patent must issue," and that issuance of the patent is "a relatively ministerial act." *Brenner*, 398 F.2d at 764. The *Brenner* plaintiffs failed to pay the issue fee within the statutory three month time period because of an error by their attorney. When plaintiffs tried to pay the fee almost seven months after it was due, defendant PTO rejected the payment. Plaintiffs tried to revive the application. The Commissioner dismissed the petition. Plaintiffs brought suit to reverse the dismissal, compel revival, acceptance of the fee, and issuance of the patent. *Id.* at 763. The court upheld the PTO's dismissal. Defendant notes that, since *Brenner* concerned the timing of payment of the issue fee, and not the PTO's authority to withdraw a patent from issue, the language on which plaintiff relies is dicta. Defendant is correct. In fact, the court expressly set aside meaningful consideration of the patent issuance language, preceding the language on which plaintiff relies with "[c]ongress established a separate statutory framework for what remains—issuance of the patent." Accordingly, the Court is not persuaded by this language.

---

**6.** The PTO has interpreted the "shall issue" language as allowing the withdrawal of a patent after payment of the issue fee for almost a century. *See* Rules of Practice in the Patent Office § 165–55 (1888–1848); Rules of Practice of the United States Patent Office in Patent Cases § 313 (1949–1972); *and see* 37 C.F.R. § 1.313(b) (1973–1996).

**7.** Plaintiff also cites Judge Newman's concurring opinion in *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 935 F.2d 1263 (Fed.Cir.1991), as persuasive authority in support. Defendant notes that this was only a concurrence, and therefore "not the law," as Judge Newman herself pointed out in *Pioneer Hi–Bred Int'l, Inc. v. J.E.M. Ag Supply, Inc.*, 200 F.3d 1374, 1378 (Fed.Cir.2000).

Plaintiff also cites *United States Gypsum Co. v. Masonite Corp.*, 21 F.Supp. 551 (D.Del.1937) in support of its mandatory interpretation of the "shall issue" language. In *Gypsum*, the court held that the defendant had a legal right to pay the final patent fee. In interpreting identical "shall issue" language in an earlier version of § 151, the court stated that "the Commissioner is bound by statute to issue the patent" once the final fee has been paid. *United States Gypsum Co. v. Masonite Corp.*, 21 F.Supp. 551, 552 (D.Del.1937). Defendant discounts the *Gypsum* holding by noting that there, as in *Brenner*, the issue before the court was not whether the PTO has the authority to withdraw a patent application from issue after payment of the issue fee; it was whether the district court should enjoin a patent applicant from paying the issue fee on its allowed application. Accordingly, defendant argues, and the Court agrees, this holding has no relevance to the present case. As with *Brenner*, the Court places no reliance on the language plaintiff cites.

Finally, plaintiff cites *Sampson v. Dann*, 466 F.Supp. 965 (D.D.C.1978), which is factually analogous to the present case. In a prior lawsuit, the *Sampson* court had remanded the *Sampson* plaintiff's case to the PTO for the purpose of granting plaintiff a reissue patent. On remand, the PTO examiner completed the patent examination, the PTO sent plaintiff a notice of allowance, and plaintiff timely paid the fee. The PTO mailed plaintiff a notice scheduling the issuance of the patent. Before the patent was issued, however, a defendant in a separate patent infringement action brought by Sampson contacted the PTO to inform the PTO of prior art not considered during the review of the original application. In response, PTO officials examined the prior art, and directed that the prior art be withdrawn from issue because the prior art raised doubts about patentability. Plaintiff returned to court and argued that he was entitled to have the patent issued. The court agreed, holding that Congress' command in § 151 that " 'the patent shall issue' created an enforceable right in Sampson." *See Sampson v. Dann*, 466 F.Supp. 965, 972 (D.D.C.1978). The court also postulated that "[t]he Patent and Trademark Office's over-all effectiveness as a protector of that public interest might well be enhanced by strict and merciful cut-off of Patent and Trademark Office consideration of an individual patent application once notice and payment have been effected, particularly one that has been so prominent and protracted as Sampson's." *Id.*

Unlike the *Brenner* and *Gypsum* courts, the *Sampson* court considered the issue presented in the present case: whether defendant has the authority to refuse to issue a patent once the issue fee has been paid. Accordingly, defendant addresses it by citing a more recent case from this court, *Harley v. Lehman*, 981 F.Supp. 9 (D.D.C.1997), which also considered the issue in the present case, but which discounts the *Sampson* case because of a subsequent change in the PTO's implementing regulations.

*Harley* is factually and procedurally identical to the present case. In *Harley*, plaintiff's application was allowed, plaintiff paid the issue fee, and a patent number and issue date were set. Just five days before the issue date, pursuant to 37 C.F.R. § 1.313(b)(3), the PTO withdrew the application, because a PTO director became concerned about the possible unpatentability of the application's claims. The applicant sued in district court, asserting, as Blacklight does, that the Commissioner lacked the statutory authority to withdraw the patent once the issue fee had been paid. The *Harley* court held that the PTO regulation allowing withdrawal of a patent from issue based on unpatentability was a reasonable interpretation of 35 U.S.C. § 151. The court also noted the historic coexistence of the ostensibly vying statutes as further proof that the PTO's interpretation was reasonable.

The *Harley* court specifically discounted the *Sampson* case. Like Blacklight, the *Harley* plaintiff relied on *Sampson*. The *Harley* court held, however, that "[p]laintiff's reliance on *Sampson v. Dann* . . . is misplaced . . . . [because t]he regulation at issue in this case had not yet been enacted when *Sampson* was decided."[8] *Harley*, 981 F.Supp. at 12 n. 3. The *Sampson* court considered the interplay between 35 U.S.C. § 151 and 37 C.F.R. § 1.313(b) before the unpatentability ground, or subsection (3), had been added to the latter provision. Accordingly, the provision allowed the PTO to withdraw the patent after payment of the issue fee only in cases of (1) a mistake on the part of the Office, and (2) a violation of § 1.56 [fraud] or illegality in the application. The *Sampson* court held that, since there was evidence of neither mistake nor fraud, the PTO was legally bound to issue plaintiff's patent. Defendant's argument on this score, therefore, is double-edged: not only is *Sampson* totally void of persuasive authority here, but *Harley* is controlling.[9]

The Court finds that *Harley*, and not *Sampson*, is the more persuasive authority. First, the *Sampson* opinion, in a crucial section, includes language that effectively approvingly presages the addition of subsection (3):

> It may be that fraud by the applicant, or even good cause for the failure by the Patent and Trademark Office to discover the prior art earlier would justify a courtfashioned exception to the statutory command. For example, Patent and Trademark Office custom might have established and Congress might have accepted such an exception. But the Patent and Trademark Office has failed to offer any persuasive proof of such a custom or its acceptance by Congress. Moreover, there is a substantial difference between fraud or other questionable action by an applicant which might justify such an exception and the receipt of prior art allegations raising routine substantive questions about patentability of a widely known invention claim which is at least ten years old. *Sampson*, 466 F.Supp. at 972–3.

Second, the Court is persuaded that the fact that the *Harley* court squarely considered subsection (3), while the *Sampson* court did not, makes *Harley* more persuasive. Accordingly, this Court finds that, under the applicable caselaw, defendant's interpretation of the governing patent issuance statutes is reasonable.

### B. Which PTO Issuance Constituted Reviewable Final Agency Action

■ The parties disagree over which of the February 17 Notice or the March 22 Decision constituted final, reviewable agency action under the APA. Under 5 U.S.C. § 704, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." For these purposes, " 'agency action' includes the whole or part of an agency rule, order, license, sanction, relief,

---

8. When *Sampson* was decided in 1978, the PTO's regulations did not expressly allow withdrawal on the basis of unpatentability after payment of the issue fee. The regulation was amended in 1982 specifically to allow withdrawal from issue on the basis of "unpatentability of one or more claims." *See* 37 C.F.R. § 1.313(b)(3).

9. At the May 22, 2000 hearing, plaintiff argued that there actually is no functional difference between the *Sampson* court's consideration of the pre-subsection (3) regulation and the *Harley* court's consideration of the post-subsection (3) regulation. *See* May 22,

2000 Hr'g Tr. at 63. Plaintiff argued that, in *Harley*, the PTO indicated that they relied on the mistake exception to justify the withdrawal of the *Harley* plaintiff's patent, and that the mistake was the unpatentability of plaintiff's claim. In other words, plaintiff argues defendant slid subsection (3) unpatentability under subsection (1) exception. Therefore, both courts were actually considering the same subsection—subsection (1)—and the fact that subsection (3) had been passed is of no consequence. *Id.* The Court disagrees. The *Harley* opinion clearly indicates that subsection (3), and not subsection (1), was at issue. *See* Harley, 981 F.Supp. at 9, 11.

or the equivalent or denial thereof, or failure to act. . . ." 5 U.S.C. § 551(13). The parties do not dispute whether the February 17 Notice and the March 22 Decision constitute "agency action" under the meaning of the statute; they disagree over which agency action is "final" and therefore "reviewable."

Plaintiff contends that the February 17 Notice is the final, reviewable agency action. *See* Pl.'s Mot. for Summ. J. at 31–3. Courts must interpret the "finality" element flexibly and practically. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Furthermore, in order to be final, the ruling must not have been issued by a subordinate official. *See Franklin v. Massachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Plaintiff argues that the February 17 Notice constitutes the PTO's final action because that Notice effectively vitiated the enforceable right to the '601 patent that arose upon plaintiff's payment of the issue fee. It was definitive action, in that plaintiff's patent counsel's efforts to reverse the Notice were unavailing. And, practically speaking, it had the very concrete effect of delaying Blacklight's planned public offering.

Plaintiff further argues that the February 17 Notice is the final agency action because the March 22 Decision is merely a post hoc, pretextual rationalization cooked up for litigation purposes. The March 22 Decision was issued after plaintiff filed its lawsuit. Plaintiff characterizes the Decision as a new record made for the reviewing court. *See Consumer Federation of America v. U.S. Department of Health and Human Services,* 83 F.3d 1497, 1506 (D.C.Cir.1996). Accordingly, plaintiff argues, the Court should not consider it the final agency action.

Defendant responds, and the Court agrees, that the March 22 Decision constitutes the "final agency action within the meaning of 5 U.S.C. § 704 for purposes of seeking judicial review." *See* Pl.'s Mot. for Summ. J., Ex. 8, n. 1.

*C. Administrative Procedure Act Claims: Whether the PTO's March 22 Decision Was Arbitrary and Capricious*

Plaintiff argues, alternatively, that even if the Court is convinced that § 151 does not forbid the withdrawal of an application from issue after payment of the issue fee, the PTO's withdrawal of the patents-in-application was arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706 *et seq.* The APA authorizes the Court to issue an injunction to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), and therefore, plaintiff contends, this Court is authorized to order the PTO to issue the 5 patent applications as patents. The APA also authorizes the Court to "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or agency action that is "in excess of statutory jurisdiction authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

Plaintiff avers that the PTO, in contravention of its own proffered justification for withdrawal of the patents-in-application, did not make the required determination of unpatentability. Here, the March 22 decision upholding the February 17 notice indicated that the PTO relied on 37 C.F.R. § 1.313(b)(3), which allows withdrawal due to the "unpatentability of one or more claims," to justify its withdrawal of the patents-in-application. Plaintiff interprets that regulation to mean that a patent can be withdrawn only upon a finding of unpatentability, not upon a possibility of unpatentability. But, plaintiff points out, the March 22 decision indicates that the February 17 notice was issued at the PTO Director's request because she believed that Blacklight's applications "raise[d] a substantial question of patentability on one or more claims." March 22 Decision at 2. Therefore, by defendant's

own admission, the PTO has not made a final determination on unpatentability, and so acts in violation of its own regulations, and the APA.

Defendant responds that plaintiff makes this argument about PTO regulations without citing any authority. On the other hand, defendant's own Manual of Patent Examining Procedure (MPEP) § 1308.1 makes clear that withdrawal on the basis of unpatentability after payment of the issue fee is a 2–step process: first, "the actual withdrawal will be handled by the Office of Patent Publications and then the application will be returned to the examiner" and the unpatentable claims are rejected. Defendant further points out that this interpretation of the PTO regulation was upheld in *Harley*, in which the applicant's claims were not formally rejected until 6 months after his application had been withdrawn from issue. *Harley*, 981 F.Supp. at 12.

The Court is persuaded by the defendant's argument. The unpatentability subsection functions as a last-chance procedural measure to enable defendant to observe the PTO's central mandate of issuing viable patents. It is not a final pronouncement of unpatentability. The March 22, 2000 Decision informed plaintiff of this posture; it stated that the Director's decision to withdraw the patent from issue did not constitute either a rejection or an adverse action on the ultimate determination of unpatentability. *See* Pl.'s Mot. for Summ. J., Ex. 8 at 4. Plaintiff has remedies outside this suit and

this Court. *See* May 22, 2000 Hr'g Tr. at 55–59. Those remedies undermine plaintiff's suggested interpretation of the statute. Any subsection (3) determination of unpatentability will necessarily represent only a possibility of unpatentability, since such a determination, as defendant has made abundantly clear, is not in any way a final rejection. The PTO's withdrawal of plaintiff's patent application in order to reconsider its patentability was neither arbitrary nor capricious.[10]

## V. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment [13–1] is **GRANTED;** and it is

**FURTHER ORDERED** that plaintiff's motion for summary judgment [11–1] is **DENIED;** and it is

**FURTHER ORDERED** that the Clerk shall enter final judgment in favor of defendant and against plaintiff.

10. This Court is troubled by several steps in the PTO's process, however. Defendant claims that the technology of the '294 application contravenes fundamental laws of chemistry and physics, yet the application was approved by a patent examiner, never reviewed by a supervisor, and would have issued as a patent but for the PTO's eleventh hour withdrawal. Defendant conceded at the May 22, 2000 hearing that the '294 application was withdrawn just days before the issuance date without the benefit of any PTO employee's reevaluating the file. Also, the February 17 Notice, released twelve days before the scheduled issue date, gave no reason for the withdrawal besides a cryptic citation to 37 C.F.R. § 1.313(b)(3). At the May 22, 2000 hearing, defendant represented that these are common occurrences, because of the enormous number of patent applications that need to be addressed each year, and the "tremendous pressure" placed on patent examiners to produce work. *See* May 22, 2000 Hr'g Tr. at 48. Defendant may be well-advised to examine its patent issuance process so that their normal operations are not compromised by such seemingly suspicious procedures.